UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
GOLDEN KRUST PATTIES, INC., et al.,

       Plaintiffs,        MEMORANDUM
                    AND ORDER

   -against-           13-CV-2241 (RLM)

MARILYN BULLOCK, et al.,

        Defendants.
-----------------------------------------------------------------x

ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:

   The central question before this Court is whether a former franchisee of a Caribbean-style fast-food chain should be preliminarily enjoined from operating a Caribbean-style fast-food restaurant within the same vicinity of the former franchise and other like franchise locations.

   Plaintiffs Golden Krust Patties, Inc. and Golden Krust Franchising, Inc., d/b/a Golden Krust Caribbean Bakery & Grill (collectively, "Golden Krust" or "plaintiffs"), brought this lawsuit against Marilyn Bullock ("Bullock") and Marilyn's Patties, Inc., d/b/a Golden Krust Bakery ("Marilyn's Patties") (collectively, "defendants").  Defendants, until recently, operated a Golden Krust franchise in Elmont, New York (the "Franchise").  Plaintiffs allege that defendants, while operating the Franchise, sold competing food products under the Golden Krust name, in violation of the parties' franchise agreement and federal trademark laws.  See Complaint (Apr. 12, 2012) ("Compl."), Electronic Case Filing ("ECF") Docket Entry ("DE") #1.  Currently pending before this Court is plaintiffs' motion for a preliminary injunction seeking to enforce a restrictive covenant against defendants and their agents from operating a competing business pending a final resolution of the parties' dispute.  See Memorandum of

Law in Support of the Plaintiffs' Application for a Temporary Restraining Order and

Preliminary Injunction ("Pl. Mem."), DE #6.

For the reasons set forth below, the Court grants plaintiffs' motion in substantial part,

as further described herein.  In addition, plaintiffs are directed to post a bond in the amount of

$20,000, in accordance with Rule 65(c) of the Federal Rules of Civil Procedure ("FRCP").

BACKGROUND

I.      The Parties Enter Into the Agreement

Plaintiffs manufacture and sell Caribbean food products under the names "Golden

Krust" and "Golden Krust Patties," both of which are trademarks registered with the United

States Patent and Trademark Office.  See Compl. ¶¶ 10, 13.  These food products are sold to

consumers in Caribbean-style fast-food establishments -- called Golden Krust Caribbean

Bakery & Grill Restaurants --  for which plaintiff Golden Krust Franchising, Inc. ("GK

Franchising") is the franchisor.  See Compl. ¶ 16.  In connection with these franchise

operations, plaintiffs have developed a "proprietary system," which includes "proprietary

processes, materials, manuals and rights relating to the development, promotion, franchising

and operation" of said restaurants.  See id.

On March 10, 2006, GK Franchising entered into a franchise agreement with

defendants (hereinafter, the "Agreement").  See Agreement, DE #5-3 at 7-42.[1]  The

_____

[1]  The Agreement identified Marilyn Bullock as the contracting party, see Agreement at 1, but
expressly authorized transfer of the Agreement to the franchisee's wholly-owned corporation,
with the owner remaining personally liable under the Agreement.  See id. § XIII(D) (at p. 16);
see also id. at Ex. A (identifying Bullock as 100% owner of Marilyn's Patties).  Plaintiffs'
Complaint states that both "defendants" entered into the Agreement, see Compl. ¶ 20 -- an
allegation that defendants neither admit nor deny.  See Answer (July 8, 2013) ¶ 20, DE #38.

Agreement authorized defendants to operate a Golden Krust Caribbean Bakery & Grill at 1717 Dutch Broadway in Elmont, New York.  See id. § I(D).  Among other things, the Agreement granted defendants a license to use plaintiffs' trademarks and forbade defendants from engaging in any "unauthorized use" of those trademarks.  See id. § V(A).  In particular, the Agreement prohibited defendants from using the trademarks "in connection with the performance or sale of any unauthorized services or products or in any manner . . . not expressly authorized in writing."  See id. § V(B).  Moreover, if defendants "engage[d] in any dishonest or unethical conduct which [might] adversely affect the reputation of the [Franchise] or another Golden Krust Caribbean Bakery & Grill Restaurant or the good will associated" with plaintiffs' trademarks, then plaintiffs had the right to terminate the Agreement, upon written notice to defendants.  See id. § XIII(B)(7) (at p. 19).

    In addition to the above sections, the Agreement contained a non-compete provision, which stated, in relevant part, that upon termination of the Agreement by plaintiffs:

> [defendants agree that] for a period of two (2) years commencing on the
> effective date of termination or expiration or the date on which a person
> restricted by this Paragraph begins to comply with this Paragraph, whichever is
> later, neither [defendants] nor any of [defendants'] owners will have any direct
> or indirect interest (e.g., through a spouse or child) as a disclosed or beneficial
> owner, investor, partner, director, officer, employee, consultant, representative
> or agent or in any other capacity in any Competitive Business (as defined in
> Section VII above) operating
>     (a)     at the [Franchise location];
>     (b)     within ten (10) miles of the [Franchise location]; or
>     (c)     within five (5) miles of any other Golden Krust Caribbean
>              Bakery & Grill in operation or under construction . . . .

Agreement § XIV(D)(4) (hereinafter, the "Non-Compete Provision").  The term "Competitive Business" was defined in the Agreement as "any business operating, or granting franchises or licenses to others to operate, any restaurant or food service business (other than a Golden

3

Krust Caribbean Bakery & Grill Restaurant operated under a franchise agreement with us)."

See id. § VII (emphasis added). Thus, the Non-Compete Provision, as drafted, would, upon termination of the Agreement, preclude defendants from operating any type of restaurant, regardless of whether Caribbean-style food was sold.

II.      Defendants Sell Unauthorized Products and Plaintiffs Terminate the Agreement

On or about April 1, 2013, Karen Gasciogne ("Gasciogne"), a franchise consultant for Golden Krust, performed a routine restaurant inspection at the Franchise. See Affidavit of Stephen Ament (Apr. 10, 2013) ("Ament Aff.") ¶ 4 , DE #5-1. During her visit, Gasciogne discovered that defendants were selling food products made by a competitor of Golden Krust. See id. Later that same day, Stephen Ament ("Ament"), Vice President of Franchise Operations for plaintiffs, also visited the Franchise, where he confirmed Gasciogne's observations. See id. ¶ 5. According to Ament, defendants were not only selling the competitor's products (i.e., frozen Caribbean-style patties), but were selling those products using Golden Krust packaging. See id. ¶ 6. Ament purchased several items during his visit that day and confirmed that none of the food products had been produced by Golden Krust. See id. ¶ 7.

The next day, plaintiffs sent a Notice of Termination Rights letter to defendants. See Ament Aff. ¶ 8; Letter (Apr. 2, 2013) ("Termination Letter"), DE #5-3 at 43. Despite notification that plaintiffs were electing to terminate the Agreement, defendants continued to operate the Franchise using the Golden Krust trademarks and trade dress. See Ament Aff. ¶ 9; Photos of Franchise, DE #5-1 at 13-17. Soon thereafter, plaintiffs filed the instant action.

III.     Plaintiffs File for TRO and Preliminary Injunction

On April 12, 2013, plaintiffs filed a Complaint and an application for a temporary restraining order and preliminary injunction.  <u>See</u> Compl.; Pl. Mem.[2]  Specifically, plaintiffs sought to enjoin defendants from (1) using or displaying Golden Krust's trademarks or otherwise engaging in acts that would cause consumer confusion as to the sponsorship or origin of defendants' goods or services; and (2) operating a restaurant business within the geographical and temporal scope of the Non-Compete Provision.  <u>See</u> Unsigned Order to Show Cause (Apr. 12, 2013), DE #5.  The Honorable Edward R. Korman, the District Judge then assigned to the case, issued a TRO granting trademark relief, but declined to grant ex parte relief relating to the Non-Compete Provision; he referred the motion for a preliminary injunction to the undersigned magistrate judge for a report and recommendation.  <u>See</u> Order to Show Cause (Apr. 12, 2013), DE #8.  The parties subsequently consented to have this Court handle the case for all purposes.  <u>See</u> Consent to Jurisdiction (May 22, 2013), DE #19.

Meanwhile, on April 18, 2013, this Court held a show-cause hearing on plaintiffs' application for a preliminary injunction.  <u>See</u> Minute Entry (Apr. 18, 2013), DE #11.  During the proceeding, the parties informed the Court that they were trying to resolve the case and would stipulate to a preliminary injunction covering the trademark issues but not those related to the Non-Compete Provision.   The next day, the parties submitted a proposed consent

_____

[2]  Although the Agreement contains a mandatory arbitration provision, that provision permits either party to "obtain temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction; provided, however, that [the parties] must contemporaneously submit [the] dispute for arbitration on the merits as provided herein." Agreement § XVI(E)(4).  On July 1, 2013, plaintiffs confirmed that they had initiated arbitration, in accordance with the Agreement.  <u>See</u> Letter (July 1, 2013), DE #32.

preliminary injunction, limited to the trademark issues, and Judge Korman entered the order. See Preliminary Injunction (Apr. 19, 2013), DE #13.

Thereafter, the parties attempted to reach agreement with respect to the case as a whole, including the Non-Compete Provision. See, e.g., Minute Entry (Apr. 29, 2013) (noting that the parties were engaging "in settlement discussions and will continue to attempt to narrow their differences"). To keep matters on a relatively fast track, the Court directed that, while settlement talks were ongoing, both parties submit letter-briefs addressing the Non-Compete Provision, see id., and they did so. See Plaintiffs' Letter-Brief re Restrictive Covenant (May 8, 2013) ("Pl. 5/8/13 Ltr."), DE #16; Defendants' Letter-Brief re Restrictive Covenant (May 8, 2013) ("Def. 5/8/13 Ltr."), DE #17.

On May 22, 2013, the Court held an evidentiary hearing on whether to grant a preliminary injunction enforcing the Non-Compete Provision. See Minute Entry (May 22, 2013), DE #20. On plaintiffs' case, they introduced photographs taken of the Franchise on May 13, 2013, more than one month after the initiation of this lawsuit. See Hearing Transcript (May 22, 2013) ("Tr.") 9-10, DE #36. The photographs show that, while defendants had removed any external signs or trade dress containing plaintiffs' trademarks or logos, defendants had not replaced those with signage reflecting a new name, trademark or logo; instead, the following signs were posted in the windows of the establishment: a large yellow sign that read: "Come on in. We Are Open"; a smaller handwritten dark pink sign that read: "Come in. We are Open. Nothing has Changed Only Our Name"; and another small dark pink sign that read: "Open. Same Great Food, Same Great Service. Thanks for Your Support!!! Come Again." See Exhibits 1, 2, 3, and 4 (collectively, "Sign Photos"); Tr. at 10.

At the hearing, defendant Bullock testified that her son, Lincoln Bennett ("Bennett"), had managed the Franchise prior to the termination of the Agreement and continued to operate the "new" Caribbean restaurant at the same location, post-termination. <u>See</u> Tr. at 22. Bullock acknowledged that, in doing so, Bennett was acting as her agent. <u>See</u> <u>id</u>. And just as the pink signs indicated, the new Caribbean restaurant continues to sell the same kind of food products as Golden Krust, although defendants no longer buy a particular seasoning used by Golden Krust. <u>See</u> <u>id</u>. at 21, 27.

Over the next few weeks, with the Court's guidance, the parties continued to try to resolve the case. <u>See, e.g.</u>, Minute Entry (June 6, 2013), DE #24; Minute Entry (June 18, 2013), DE #26; Minute Entry (June 25, 2013), DE #28. Ultimately, however, the parties reached an impasse.

DISCUSSION

I.    Legal Standard for Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." <u>Winter v. Natural Resources Defense Council, Inc.</u>, 555 U.S. 7, 24 (2008). Historically, the Second Circuit has required a movant to meet a two-prong test in order to warrant preliminary injunctive relief: (1) irreparable harm and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting relief. <u>See</u> <u>Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.</u>, 598 F.3d 30, 35 (2d Cir. 2010) (noting that the Second Circuit had applied its two-prong test "[f]or the last five decades").

Then in 2008, the Supreme Court framed the preliminary injunction standard as a four-

7

prong test.  See Winter, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must

establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm

in the absence of preliminary relief, that the balance of equities tips in his favor, and that an

injunction is in the public interest.").  Thus, the Winter standard differs from the traditional

Second Circuit test in two respects.  First, it adds a public interest consideration.  Second, it

requires the balance of equities to tip in the movant's favor, though not necessarily

"decidedly" so, even where the movant is found likely to succeed on the merits.  As noted

above, the Second Circuit test only required a balance of equities in the event the movant

raised serious questions going to the merits but failed to establish a likelihood of success on

the merits.  See Citigroup v. VCG, 598 F.3d at 38 (reaffirming that, even in light of Winter, a

movant need not show a likelihood of success on the merits, if serious questions are raised and

the equities tip decidedly in movant's favor).

     In 2010, two years following Winter, the Second Circuit restated its test for a

preliminary injunction in the context of a copyright case:

> First, as in most other kinds of cases in our Circuit, a court may issue a
> preliminary injunction in a copyright case only if the plaintiff has demonstrated
> either (a) a likelihood of success on the merits or (b) sufficiently serious
> questions going to the merits to make them a fair ground for litigation and a
> balance of hardships tipping decidedly in the [plaintiff]'s favor.  Second, the
> court may issue the injunction only if the plaintiff has demonstrated that he is
> likely to suffer irreparable injury in the absence of an injunction. . . . .  Third,
> a court must consider the balance of hardships between the plaintiff and
> defendant and issue the injunction only if the balance of hardships tips in the
> plaintiff's favor.  Finally, the court must ensure that the public interest would
> not be disserved by the issuance of a preliminary injunction.

Salinger v. Colting, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal citations and quotations

omitted).  Thus, in the copyright context, the Salinger court adopted a four-prong preliminary

injunction test, similar to Winter; but, like the decision in Citigroup v. VCG, Salinger authorizes the issuance of a preliminary injunction without a showing of likelihood of success on the merits, where the plaintiff demonstrates serious questions going to the merits and a balance of hardships that not only tips in the plaintiff's favor but does so decidedly. The Court in Salinger suggested in a footnote that the same test would apply "to an injunction in any type of case." See Salinger, 607 F.3d at 77 n.7 (emphasis in original).

Nevertheless, in an unpublished decision issued the very next year, the Second Circuit applied its traditional two-prong test in reviewing a preliminary injunction based on a restrictive covenant, see IDG USA, LLC v. Schupp, 416 F.App'x 86, 87 (2d Cir. Mar. 25, 2011), only to apply a three-prong test in a reported case a few months later. See Oneida Nation of N.Y. v. Cuomo, 645 F.3d 154, 164 (2d Cir. 2011) (requiring two traditional prongs, plus public interest showing, citing Winter). In 2012, in an unreported decision involving preliminary injunctive relief against a former franchisee, the Second Circuit again set forth a three-prong test for determining whether a preliminary injunction should issue. Specifically, the Court stated:

> In order to justify a preliminary injunction, a movant must demonstrate (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff[']s favor; and (3) that the public's interest weighs in favor of granting an injunction.

Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC, 468 F.App'x 43, 45 (2d Cir. Mar. 19, 2012) (quoting Metro. Taxicab Bd. of Trade v. City of N.Y., 615 F.3d 152, 156 (2d Cir. 2010)). The preliminary injunction test endorsed by the Singas Court is ambiguous with respect to whether the second prong requires a balance of hardships showing even with a

likelihood of success, as in Winter.[3]  Although not an issue on appeal in Singas, it is noteworthy that the District Court in that case considered the balance of hardships in issuing a preliminary injunction, despite the fact that the plaintiffs had shown they were likely to succeed on the merits.  See Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC, No. 10 Civ. 8976 (RJH), 2011 WL 497978, at *10, *12 (S.D.N.Y. Feb. 10, 2011), aff'd, 468 F.App'x 43, 45 (2d Cir. Mar. 19, 2012).

In the months following its decision in Singas, the Second Circuit apparently reverted back to its traditional two-prong test, with no mention of a public interest requirement or independent balance-of-equities element.  See Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc., 696 F.3d 206, 215 (2d Cir. 2012) ("The District Court may grant a preliminary injunction if the moving party establishes (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.") (citing UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc., 660 F.3d 643, 648 (2d Cir. 2011)) (internal quotation marks omitted); Hyde v. KLS Prof'l Advisors Grp., LLC, 500 F.App'x 24, 25 (2d Cir. Oct. 12, 2012) (applying two-prong test in restrictive covenant case); Johnson v. Burge, 506 F.App'x 10, 11 (2d Cir. 2012) (applying two-prong test); see also SEC v. Citigroup Global Mkts., Inc., 673 F.3d 158, 163 n.1 (2d Cir. 2012) (construing Winter to mean "that when a court orders injunctive relief, it should ensure that injunction does not cause harm to the public interest").

---

[3]  That is, it is not clear whether the clause beginning "with a balance of hardships . . ." qualifies only the serious-question showing, or whether that clause also applies even where the movant demonstrates a likelihood of success.

To say that there is confusion in this Circuit regarding the appropriate standard for assessing an application for a preliminary injunction would be an understatement. Nevertheless, a four-part standard appears to have emerged from the reported Second Circuit cases (such as Salinger and Citigroup v. VCG). In addition to the two factors embraced by the Second Circuit's traditional analysis (concerning the strength of the plaintiff's claims and the irreparable harm suffered by the plaintiff absent injunctive relief), the post-Winter standard requires the Court to consider the public interest and to "balance the competing claims of injury[.]" Salinger, 607 F.3d at 79 (citing Winter). Consistent with Winter, where a plaintiff demonstrates a likelihood of success on the merits, the Court must nonetheless consider the balance of hardships "and issue the injunction only if the balance of hardships tips in the plaintiff's favor." Salinger, 607 F.3d at 80 (citing Winter, 547 U.S. at 391). However, where the plaintiff is unable to demonstrate a likelihood of success on the merits, but succeeds in establishing "sufficiently serious questions going to the merits to make them a fair ground for litigation," the movant "must additionally establish that the balance of hardships tips decidedly in its favor[.]" Citigroup v. VCG, 598 F.3d at 35 (citation omitted; emphasis added in Citigroup). As a consequence, the movant's "overall burden is no lighter than the one it bears under the 'likelihood of success' standard." Id.

Plaintiff's showing in this case will now be analyzed under the four-part Winter standard, as elaborated by the Second Circuit in Salinger and Citigroup v. VCG.

A.    Irreparable Harm

A showing of irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." Faiveley Transp. Malmo AB v. Wabtec Corp., 559

11

F.3d 110, 118 (2d Cir. 2009) (internal quotation and citation omitted). "Generally, when a party violates a [reasonable] non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm for purposes of imposing a preliminary injunction." Singas, 468 F.App'x at 46 (citation and internal quotation omitted). The Second Circuit has made clear, however, that irreparable harm may not be automatically assumed in cases involving restrictive covenants, but instead must depend "upon the factual particulars in each case." Id.

Here, plaintiffs identify two types of irreparable harm: (1) the loss of good will or business relationships and (2) defendants' use of their trade secrets by virtue of their seven years with the Golden Krust franchise system. See Pl. 5/8/13 Ltr. at 2; Pl. Mem. at 19-22. The Court concludes that plaintiffs have sustained their burden only with respect to the loss of good will.

1.      Loss of Good Will or Business Relationships

Although not readily defined, good will has recently been described as the "expectancy of continued patronage[.]" Singas, 2011 WL 497978, at *6; see also Nat'l Elevator Cab & Door Co. v. H & B, Inc., No. 07 CV 1562 (ERK) (RML), 2008 WL 207843, at *5 (E.D.N.Y. Jan. 24, 2008) (noting that good will "typically includes not only the likelihood that customers will return to the old place of business, but the competitive advantage of an established business"), aff'd, 282 F.App'x 885 (2d Cir. June 27, 2008); see id. ("[G]ood will constitutes the intangible qualities of a business that attract customers . . . ."). Despite the amorphous nature of good will, courts require some factual predicate to support a finding that, absent an injunction, there is an imminent danger that a party's good will will be irreparably

12

harmed.  See Singas, 2011 WL 497978, at *6 ("conclusory statements of loss of reputation and good will constitute an insufficient basis for a finding of irreparable harm") (internal quotation and citation omitted).

The facts of this case support a finding that without an injunction enforcing the Non-Compete Provision, plaintiffs will continue to suffer harm to their good will.  As an initial matter, "[t]here is a recognized danger that former franchisees will use the knowledge that they have gained from the franchisor to serve its former customers, and that continued operation under a different name may confuse customers and thereby damage the good will of the franchisor."  ServiceMaster Residential/Commercial Servs. L.P. v. Westchester Cleaning Servs., Inc., No. 01 Civ. 2229 (JSM), 2001 WL 396520, at *3 (S.D.N.Y. Apr. 19, 2001). This danger is even more inherent here, where defendants continue to operate out of the same location as the former Franchise.  See Singas, 2011 WL 497978, at *8 ("'[T]he danger of lost good will 'can be particularly true where the business operates out of the same location.'") (quoting ServiceMaster Residential/Commercial Servs., 2001 WL 396520, at *3); see also BP Prods. N. Am., Inc. v. Motor Parkway Amoco, No. CV-06-0833 (SJF)(ARL), 2006 WL 6928862, at *5 (E.D.N.Y. Aug. 21, 2006) (good will and reputation of franchisor harmed by, inter alia, fact that defendant's new business operated out of same location as former franchise).

In addition, the evidence in this case unequivocally establishes that even after defendants removed plaintiffs' trademarks and trade dress, defendants brazenly sought to exploit plaintiffs' good will, by displaying signs that declared: "Come in. We are Open. Nothing has Changed Only Our Name," and "Open. Same Great Food, Same Great Service.

Thanks for Your Support!!! Come Again."[4]  See Sign Photos.  That plaintiffs did not proffer evidence of actual consumer diversion is not dispositive, since proof of attempts to solicit returning customers is sufficient to establish irreparable harm.  See Nat'l Elevator Cab & Door, 2008 WL 207843, at *8; see also Rescuecom Corp. v. Matthews, No. 5:05-CV-1330 (FJS/GJD), 2006 WL 1742073, at *2 (N.D.N.Y. June 20, 2006) (finding that solicitation of customers by former franchisee operating competing business out of same location prevented franchisor from transferring those customers to a different franchise in the area).

Moreover, at the time plaintiffs commenced this action, defendants -- whose franchise had been terminated ten days earlier -- continued to display a large, brightly colored awning and sign with the Golden Krust logos and trademarks.  See Photos of Franchise, DE #5-1 at 13-17.  Although defendants removed those in response to this proceeding, they apparently made no attempt, before the evidentiary hearing, to post on the exterior of the building a new name or trademark or other trade dress.  See Sign Photos.  In short, defendants did nothing to distinguish their "new restaurant" from the prior Golden Krust, and, in all likelihood, based on signage announcing "Come On In. We're Open," returning customers would likely assume that that particular Golden Krust was in the process of remodeling.

In their opposition, defendants rely on the decision in Tutor Time Learning Centers, LLC v. KOG Industries, Inc., No. 12-CV-4129 (NGG) (RER), 2012 WL 5497943, (E.D.N.Y. Nov. 13, 2012), a 2012 case from this District.  See Def. 5/8/13 Ltr. at 3.  In Tutor Time, the district court declined to grant a preliminary judgment after finding that the

---

[4]  Indeed, once inside the restaurant, the customers would discover essentially the same kind of food.  See Tr. at 21.

plaintiff, a franchisor of childcare and educational centers, had failed to establish that its good will would be damaged if the defendants, a former franchisee, were to operate a childcare center out of the former franchise location in Queens, New York. See 2012 WL 5497943, at *1. In contrast to the instant case, the plaintiff in Tutor Time could not have opened a new childcare center in New York without first clearing certain legal procedural hurdles, which the plaintiff admittedly had not yet done. See id. at *4. Thus, when Tutor Time terminated the franchise agreement, it "ended its relationship with the customers of the Queens Location," and, for the foreseeable future, had no expectancy of their continued patronage. See id. Consequently, the court concluded, the plaintiff failed to substantiate its conclusory claim that the defendants had misappropriated the plaintiff's customers. See id. at *5. In contrast to Tutor Time, here there is photographic evidence that defendants have attempted to do just that to Golden Krust customers. See Sign Photos (soliciting past customers by promising "same great food" and "same great service") (emphasis added). Defendants' reliance on Tutor Time is therefore misplaced.

For the foregoing reasons, plaintiffs have met their burden of demonstrating that, absent an injunction, plaintiffs will suffer irreparable harm in the form of damage to their good will.

2. Misappropriation of Trade Secrets

Plaintiffs additionally claim that they will be irreparably harmed by defendants' misappropriation of their trade secrets. See Pl. 5/8/13 Ltr. at 2; Pl. Mem. at 20 ("In the present case, the Defendants acquired the refined trade secrets, knowledge, experience, and the Golden Krust System, from Golden Krust's decades of success." ). However, plaintiffs

15

provide no specific details as to what trade secrets or confidential information were misappropriated, nor do they cite any evidence suggesting that such misappropriation is likely to have occurred.  See generally Pl. 5/8/13 Ltr. at 2-3; Pl. Mem. at 20-21.  While plaintiffs alluded to a recipe manual during the evidentiary hearing, they did not produce that manual, nor could they confirm that defendants actually received it.  See Tr. at 60.[5]

Even assuming arguendo that defendants misappropriated plaintiffs' trade secrets, plaintiffs nevertheless have not established that they will thereby be irreparably harmed unless defendants are enjoined.  Plaintiffs erroneously argue that "irreparable harm is presumed and automatic when there is a likelihood that trade secrets have been misappropriated, such as in the present case."  Pl. 5/8/13 Ltr. at 2 (citing Ivy Mar Co. v. C.R. Seasons, Ltd., 907 F.Supp. 547 (E.D.N.Y. 1995)).  But the Second Circuit has explicitly rejected Ivy Mar's conclusion with respect to the presumption of irreparable harm.  See Faiveley, 559 F.3d at 118.  As the Second Circuit stated in Faiveley:

> We have previously observed that "the loss of trade secrets cannot be measured
> in money damages" where that secret, once lost, is "lost forever." FMC Corp.
> v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984) (per
> curiam). Some courts in this Circuit have read this passing observation to mean
> that a presumption of irreparable harm automatically arises upon the
> determination that a trade secret has been misappropriated. See, e.g., Ivy Mar
> Co. v. C.R. Seasons, Ltd., 907 F.Supp. 547, 567 (E.D.N.Y. 1995)
> ("[I]rreparable harm is presumed where a trade secret has been
> misappropriated."). That reading is not correct. A rebuttable presumption of
> irreparable harm might be warranted in cases where there is a danger that,
> unless enjoined, a misappropriator of trade secrets will disseminate those secrets
> to a wider audience or otherwise irreparably impair the value of those secrets.

---

[5]  Furthermore, the evidence adduced at the hearing established that Bullock had previously been operating a different Golden Krust franchise for some time without any such manual, see Tr. at 35, thereby undermining any suggestion that Bullock relied upon the proprietary information in plaintiffs' manuals in continuing to operate a Caribbean fast-food restaurant at the Franchise location.

> Where a misappropriator seeks only to use those secrets—without further dissemination or irreparable impairment of value—in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury. Indeed, once a trade secret is misappropriated, the misappropriator will often have the same incentive as the originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge.

Faiveley, 559 F.3d at 118-19 (emphasis added).

So too here, defendants have no incentive to disseminate any trade secrets they may have misappropriated from plaintiffs, as defendants presumably would want to use that information and maintain its confidentiality for their own pecuniary benefit. Thus, plaintiffs have not presented a sound factual or legal basis for finding irreparable harm caused by defendants' alleged misappropriation of plaintiffs' unspecified trade secrets.

B.      Likelihood of Success on the Merits

Turning to the second prong of the four-part test for preliminary injunctive relief, the strength of plaintiffs' breach of contract claim is sufficient to satisfy the more demanding of the two alternative aspects of this prong: likelihood of success on the merits.  Under New York law, in order to succeed on a breach of contract claim, a plaintiff must establish: (1) the existence of the contract; (2) the plaintiff's performance under the contract; (3) the defendant's breach of that contract; and (4) resulting damages.  See JP Morgan Chase v. J.H. Elec. of N.Y., Inc., 893 N.Y.S.2d 237, 239 (2d Dep't 2010); accord Singas, 2011 WL 497978, at *10.  In connection with the pending motion for a preliminary injunction, defendants do not dispute that they breached an enforceable contract between the parties (i.e., the Agreement) and that, under the terms of that Agreement, plaintiffs were entitled to terminate the Franchise; rather, defendants challenge the reasonableness of the Non-Compete Provision.

<u>See</u> Def. 5/8/13 Ltr. at 4.

    1.   Defendants' Conduct Entitled Plaintiffs to Terminate the Agreement

Here, plaintiffs' allegations -- that defendants sold food products manufactured by Golden Krust's competitors to Golden Krust consumers in Golden Krust packaging -- are sufficient to constitute a breach of the Agreement. The Agreement specifically prohibited defendants from using plaintiffs' trademarks in connection with any unauthorized products, <u>see</u> Agreement § V(B), and granted plaintiffs the right to terminate the Agreement if defendants engaged in "dishonest or unethical conduct" that adversely affects Golden Krust's reputation. <u>See</u> <u>id.</u> § XIII(B)(7) (at p. 19). It is undisputed that Golden Krust provided written notice of the termination on April 2, 2013; defendants have not raised any objection with respect to the propriety of plaintiffs' notice. <u>See</u> Termination Letter. Plaintiffs' proper termination of the Agreement triggered the operation of the Non-Compete Provision. <u>See</u> Agreement § XIV(D)(1) (Non-Compete Provision applied upon plaintiffs' "termination of this Agreement in accordance with its terms and conditions").

    2.   Reasonableness of the Non-Compete Provision

Under New York law, a restrictive covenant will be found enforceable where it is reasonable in geographical and temporal scope; is necessary to protect an employer's (or franchisor's) legitimate interest; is not harmful to the general public; and is not unreasonably burdensome to an employee (or franchisee). <u>See</u> <u>BDO Seidman v. Hirshberg</u>, 93 N.Y.2d 382, 389 (N.Y. 1999). As plaintiffs concede, <u>see</u> Tr. at 44-46, a court may, in its discretion, partially enforce an overbroad restrictive covenant if the employer (or franchisor) "has in good faith sought to protect a legitimate business interest, consistent with reasonable standards of

fair dealing[.]"  See BDO Seidman, 93 N.Y.2d at 394.

Notably, in 2012, the Second Circuit in Singas affirmed the district court's ruling

sustaining the reasonableness of a restrictive covenant that prohibited a former pizza store

franchisee from engaging in "the Italian food service business" within ten miles of the

franchisee's former location for a two-year period.  See Singas, 468 F.App'x at 46-47

(ten-mile geographical restriction was "reasonably calculated towards furthering [franchisor's]

legitimate interests in protecting its 'knowledge and reputation' as well as its 'customer good

will'") (citation omitted).

The Non-Compete Provision at issue here would similarly bar defendants from

operating a "Competing Business" within ten miles of the Franchise for a two-year period,

with an additional restriction prohibiting defendants from operating within a five-mile radius

of any other Golden Krust location.  See Non-Compete Provision.  Unlike the situation in

Singas, however, the Non-Compete Provision as written is broad enough to restrict defendants

from operating any type of restaurant business, not just those serving Caribbean-style food.

See Agreement § VII.  Apparently recognizing the potential overbreadth of the prohibition

against "any" restaurant business, plaintiffs have advised the Court that, for purposes of this

motion, they are "only attempting to prevent the [defendants] from owning or operating a

Caribbean-style restaurant or food service business[.]"  See Pl. 5/8/13 Ltr. at 1.

Even with this limitation, the Court finds the geographical scope of the Non-Compete

Provision to be somewhat overbroad.  Although the Second Circuit upheld a similar provision

in Singas, the Court of Appeals based its decision in part on the number of Singas pizza

franchises operating within the ten-mile radius.  See Singas, 468 F.App'x at 46 (noting that

there were nine Singas Famous Pizza restaurants within ten miles of the former franchise

location).  Here, in contrast, plaintiffs have presented no evidence concerning the number of

Golden Krust locations within a ten-mile radius of the former Franchise.  While defendants, in

an attempt to show the burdensome nature of the Non-Compete Provision, have submitted an

affidavit from Bullock attesting to the number of Golden Krust locations in the New York

metropolitan area, the affidavit sheds no light on the precise area at issue in this case — i.e., a

ten-mile radius from the former Franchise.  See Declaration of Marilyn Bullock (May 8, 2013)

("5/8/13 Bullock Decl.") ¶ 9, DE #17-1 ("There are 30 Golden Krust Franchises operating in

Brooklyn, 12 in Queens, 6 in Manhattan, 14 in the Bronx, and one location in Amityville,

Poughkeepsie, Hempstead, Mount Vernon, Long Island City, New Rochelle, and Spring

Valley.").

    Nevertheless, the Court takes judicial notice of the densely populated nature of the

New York metropolitan area and notes that even plaintiffs acknowledged, during oral

argument at the evidentiary hearing, that most consumers in that region will not travel ten

miles -- or even five miles -- to a fast-food establishment.  See Tr. at 48.  Given the lack of

factual submissions from both sides, the Court concludes that a four-mile restriction from the

Franchise location is more appropriate.  Such a restriction is sufficient to serve the covenant's

legitimate purpose of protecting Golden Krust's good will and preventing unfair competition,

while avoiding any undue burden on defendants, who reportedly would prefer to find a new

location for their Caribbean food business, rather than operate a non-competing business at the

same location.  See Tr. at 28-29.

    In addition, the Court will enforce the Non-Compete Provision with respect to other

Golden Krust locations, but to a more limited extent than the provision calls for. Plaintiffs have made no particular factual showing as to why this additional five-mile restriction is reasonable or is otherwise necessary. Moreover, Bullock testified that there is another Golden Krust franchise "within a mile, give or take," from her former Franchise. See Tr. at 25. In light of the close proximity between at least some Golden Krust locations, the Court doubts that Golden Krust requires such a broad non-compete zone in order to protect its good will. Therefore, the Court will enjoin defendants from operating a Caribbean-style restaurant within two and one half (2.5) miles of any other Golden Krust location.

C.     Balance of Equities

Turning to the balance of hardships, defendants have invested time and money in continuing to operate a Caribbean restaurant at the former Franchise's location. Thus, defendants would undoubtedly suffer some harm if they were enjoined from operating that restaurant and constrained to either find a suitable new location or transform their business into an establishment that does not serve or otherwise sell Caribbean food. Based on the facts before the Court at this time, however, any harm appears to stem from defendants' own wrongful conduct in passing off a competitor's product as a Golden Krust product and continuing to capitalize on plaintiffs' and the former Franchise's good will after termination of the Franchise. In such circumstances, the Court cannot say the harm to defendants outweighs the harm to plaintiffs. See Singas, 2011 WL 497978, at *12 (where "[a]ny hardship defendants would suffer from an injunction would stem from their own breaches of the Agreement and the Non-Competition Agreement," the balance of hardships weighed in favor of an injunction).

D.    Public Interest

"[W]hen a court orders injunctive relief, it should ensure that the injunction does not cause harm to the public interest." SEC v. Citigroup, 673 F.3d at 163 n.1. Defendants argue that non-parties such as defendants' landlord and employees will be harmed if the Court issues a preliminary injunction. See Def 5/8/13 Ltr. at 5. Defendants present no evidence other than Bullock's self-serving assertions to support their contention that the public will be harmed by an injunction. See 5/8/13 Bullock Decl. ¶ 8. Indeed, given defendants' conduct following the termination of the Agreement -- specifically, their continuing to operate with plaintiffs' trademarks and attempting to solicit former Golden Krust customers -- there is likely a greater harm to the public in the form of consumer confusion if defendants are not enjoined.

In conclusion, plaintiffs have persuasively established their entitlement to a preliminary injunction with respect to the Non-Compete Provision, as limited by the Court herein.

II.    Enforceability against Lincoln Bennett

As noted above, Bullock's son, Bennett, managed the Franchise on behalf of defendants and continues to operate defendants' new Caribbean restaurant at the same location. In their May 8, 2013 opposition, defendants argued, in a two-sentence paragraph unsupported by case law citations, that because Bennett is neither a party to this action, nor a signatory to the Agreement, Bennett cannot be bound by the Non-Compete Provision. See Def. 5/8/13 Ltr. at 6.

On June 28, 2013, this Court directed defendants to support their conclusory argument with respect to Bennett by submitting additional briefing "with relevant legal citations[.]" See Order (June 28, 2013) ("6/28/13 Order"), DE #30. In doing so, the Court noted that Bennett

managed the restaurant on behalf of defendants, see id. at 2, and cited Rule 65(d)(2) of the

FRCP, which states:

> (d) Contents and Scope of Every Injunction and Restraining Order.
>     (2) Persons bound. The order binds only the following who receive
>     actual notice of it by personal service or otherwise:
>         (A)   the parties;
>         (B)   the parties' officers, agents, servants, employees,
>               and attorneys; and
>         (C)   other persons who are in active concert or
>               participation with anyone described in Rule
>               65(d)(2)(A) or (B).

Fed. R. Civ. P. 65(d)(2) (emphasis in italics added).

Defendants thereafter filed a supplemental opposition. See Memorandum in Opposition

(July 3, 2013) ("Def. 7/3/13 Opp."), DE #37. Defendants largely repeated their position from

two months earlier — namely, that because Bennett is not a signatory to the Agreement nor a

party to this action, "Bennett should be allowed to operate a competing restaurant at 1717

Dutch Broadway even if the Court issues a preliminary injunction." See id. at 2. In support

of their argument, defendants cite two cases, Masefield AG v. Colonial Oil Industries, Inc., 05

Civ. 2231 (PKL), 2005 U.S. Dist. LEXIS 6737 (S.D.N.Y. Apr. 18, 2005), and AICO

International, E.C., v. Merrill Lynch & Co., Inc., 98 F.App'x 44, 46-47 (2d Cir. Apr. 28,

2004) -- neither of which addresses the applicability of Rule 65(d)(2) or otherwise involves a

court's authority to enforce an injunction against a non-party. See generally AICO Int'l, 98

F.App'x 44; Masefield, 2005 U.S. Dist. LEXIS 6737. Rather, those cases discuss whether a

non-signatory to an agreement mandating arbitration should be required to arbitrate in

accordance with that agreement. See AICO Int'l, 98 F.App'x at 46-47; Masefield, 2005 U.S.

Dist. LEXIS 6737, at *8. Based on the facts adduced in those cases, each court found that the

party seeking to compel the non-signatory to arbitrate had not sufficiently established that the non-signatory was an agent of the signatory to the agreement. See AICO Int'l, 98 F.App'x 44 at 46-47 ("[T]he conclusory allegations of a general agency relationship between a signatory and non-signatory do not suffice to compel these unwilling non-signatories to arbitrate under that theory."); Masefield, 2005 U.S. Dist. LEXIS 6737, at *15-16 (generalized allegations of agency insufficient). Here, in contrast, Bennett's agency status is undisputed, as Bullock admitted at the evidentiary hearing that Bennett acts as her agent. See Tr. at 22; see also Plaintiffs' Letter Brief (July 9, 2013) ("Pl. 7/9/13 Ltr."), DE #40.

Defendants' unsworn assurance that "Bullock, of course, will have no direct or indirect involvement in the operation of 1717 Dutch Broadway if an injunction against Defendants is enforced," see Def. 7/3/13 Opp. at 2, is unavailing for two reasons. First, in Bullock's declaration accompanying defendants' submission, she makes no such assertion or promise and the Court is entitled to ignore mere attorney argument. See generally Declaration of Marilyn Bullock (July 3, 2013), DE #37-1; Jamaica Ash & Rubbish Removal Co. v. Ferguson, 85 F.Supp.2d 174, 182 (E.D.N.Y. 2000) (an attorney's statement or argument is not evidence). Second, the Non-Compete Provision does not simply bar Bullock from direct or indirect "operation" of a competing business, but bars her from having a "direct or indirect interest (e.g., through a spouse or child) as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, representative or agent or in any other capacity" of a competing business. See Non-Compete Provision (emphasis added).

In short, defendants have cited no case law that suggests it would be inappropriate for this Court to enjoin Bennett from operating a competing business on behalf of his mother. In

24

particular, defendants do not dispute that Bennett, as an agent of Bullock, would fall within the contours of Rule 65(d)(2)(B), see supra p. 23, assuming he receives notice of the order. See United States v. Paccione, 964 F.2d 1269, 1274 (2d Cir. 1992) ("Ordinarily, the class of parties subject to an injunction or restraining order include the named parties, officers, agents, servants, employees, attorneys of the named parties and successors in interest to the property that is subject to the injunction or restraining order.") (collecting cases and citing Rule 65(d)); see also GMA Accessories, Inc. v. Eminent, Inc., No. 07 Civ. 3219(LTS)(DF), 2008 WL 2355826, at *12 (S.D.N.Y. May 29, 2008) ("Thus, where an enjoined party engages in subterfuge, and attempts to circumvent an injunction through the instrumentality of a shell company, an agent, or a successor in interest, the injunction will reach the conduct of the non-party.") (collecting cases).

Therefore, assuming that plaintiffs serve Bennett with a copy of the preliminary injunction in accordance with Rule 65(d), the preliminary injunction will be enforceable against Bennett, to the extent he continues to act as agent for defendants.

III.    Bond

A court may "issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The bond requirement "assures the enjoined party that it may readily collect damages from the funds posted in the event that it was wrongfully enjoined, and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff." Nokia Corp. v. InterDigital, Inc., 645 F.3d 553, 557 (2d Cir. 2011). The Second Circuit has

made clear that a district court "is vested with wide discretion" to determine the appropriate amount of the bond.  See Doctor's Assocs., Inc. v. Stuart, 85 F.3d 975, 985 (2d Cir. 1996) (internal quotation and citations omitted).  Indeed, despite the seemingly mandatory nature of Rule 65(c), a district court in its discretion may deny a bond altogether if there is "no proof of likelihood of harm" to the non-movant.  See id.

Defendants request that the Court enter a bond in the amount of $185,810.50.  See Def. 7/3/13 Opp. at 2.  Defendants' rationale for this amount is as follows: Defendants have signed a lease for the Franchise location that obligates them to pay a certain amount of rent through January 31, 2016.  See id.[6]  Defendants argue that, to the extent they are preliminarily enjoined from operating a competing business at 1717 Dutch Broadway or must otherwise "transition to a non-competing business," they may be liable for rental payments for the entire lease period -- lease payments they claim they would otherwise be able to pay if they were allowed to continue their current business uninterrupted.  See id.; see also Lease Agreement (Oct. 1, 2005), DE #37-2.

Plaintiffs object to a bond in any amount.  See Pl. 7/9/13 Ltr. at 2.  They dispute that defendants would suffer any harm, as under the narrowed Non-Compete Provision, defendants would be permitted to operate a restaurant at the premises subject to the lease, just not a Caribbean-style one.  See id.  In fact, plaintiffs posit that defendants "could easily transition to offering a different style of food at their restaurant without closing for even one (1) day."  Id.

---

[6]  Specifically, defendants are responsible for $7,369.22 in rent per month through September 30, 2013, $7,663.99 per month from October 1, 2013 to September 30, 2014, and $7,970.55 from October 1, 2014 until the lease expires in January 2016.  See Lease Agreement, DE #37-2 at 8.

The Court believes that plaintiffs underestimate the amount of time it would take for defendants to transition to a non-Caribbean restaurant business. According to Bullock, the only type of food she knows how to prepare is Caribbean. See Tr. at 28-29. That said, the Court is not inclined to impose a bond representing rent payments for the entire lease term, especially given defendants' acknowledgment, in the Non-Compete Provision, that they "possess skills and abilities of a general nature and have other opportunities for exploiting such skills." See Non-Compete Provision. Clearly, defendants could mitigate their damages by opening a different type of restaurant and they would not need until January 2016 to do so. Moreover, there is evidence to suggest a strong possibility that, even if plaintiffs had not terminated the Agreement, defendants would have defaulted on the lease, as Bullock testified that the Franchise had not been profitable and defendants already owed more than $25,000 in taxes to the landlord. See Tr. at 25, 35.

Finally, although not dispositive, the Court notes that this is a case where plaintiffs are almost all but likely to succeed on the merits. Some courts have considered the strength of a movant's case in analyzing the likelihood of harm to a potentially wrongfully enjoined non-movant. See Eastman Kodak Co. v. Collins Ink Corp., 821 F.Supp.2d 582, 590 (W.D.N.Y. 2011) (declining to require plaintiff to post a bond where court "find[s] it very likely that [plaintiff] will prevail on the merits of its claims"); N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F.Supp.2d 305, 345 (S.D.N.Y. 2010) (declining to require the posting of a bond where, inter alia, "the likelihood of [plaintiff's] success on the merits is overwhelming"); Rex Med. L.P. v. Angiotech Pharms. (US), Inc., 754 F.Supp.2d 616, 627 (S.D.N.Y. 2010) (finding it equitable to discount the harm non-movant would suffer, given that non-movant

had, in the court's view, a less than 5 percent chance of succeeding on the merits at arbitration). As the court explained in <u>Eastman Kodak</u>, in dispensing with the bond requirement in that case: "The greater plaintiff's likelihood of success on the merits, the lower the probability that an injunction in plaintiff's favor will later be determined to have been issued in error, and consequently that [the defendant] will be found to have wrongfully suffered harm." 821 F.Supp.2d at 590.

Thus, in its discretion, the Court will require plaintiffs to post a $20,000 bond, representing almost three months of payments under the lease. <u>See N. Am. Olive Oil Assoc. v. Kangadis Food Inc.</u>, No. 13 Civ. 868(JSR), 2013 WL 1777774, at *8 (S.D.N.Y. Apr. 25, 2013) ($10,000 security was appropriate, where non-movant's suggestion of $10 million bond was "wildly unreasonable," but court could not "conclude that [non-movant] would be totally unharmed by th[e] injunction").

Upon proof of plaintiffs posting a $20,000 bond with the Court, a preliminary injunction consistent with this Memorandum and Order will issue.

CONCLUSION

For the reasons articulated above, plaintiffs have established their entitlement to a preliminary injunction to enforce the Non-Compete Provision, as limited herein. Before the Court enters such an order, plaintiffs are directed to post a $20,000 bond with the Court. Within two business days of posting said bond, plaintiffs are further directed to notify the Court, via ECF, that they have complied with Rule 65(c)'s requirements and, after conferring with defendants, to submit a proposed preliminary injunction (to be docketed as a motion)

consistent with this Memorandum and Order.

SO ORDERED.

Dated:     Brooklyn, New York
           July 16, 2013

                        /s/ *Roanne L. Mann*
                        ROANNE L. MANN
                        UNITED STATES MAGISTRATE JUDGE